Our second case for argument this morning is Wisconsin Central v. Tienergy. Good morning, Mr. Borshe. My name is Jim Borshe. I represent Tienergy in this case. The district court granted summary judgment based upon contested facts that construed in Tienergy's favor or defining that Tienergy was not responsible for any demerge charges and that Wisconsin Central was not owed any demerge charges. So in this case, we're asking under the de novo review of the court, the judgment be reversed. I think it's important first to talk about what... Before we get too far into the merits, Mr. Borshe, I've got a couple questions about jurisdiction. The first is whether we have a final decision. I've looked at the judgment included in your appendix, and it resolves Wisconsin Central's claim against Tienergy and doesn't say anything about Tienergy's claim against Allied. And until the whole case is wrapped up, we don't have a final judgment. So why is this appealable? Well, I believe the district court did grant Allied's motion for summary judgment against Tienergy. Well, it may have granted a motion, but it didn't enter a judgment. Did anybody notice the fact that the judgment doesn't mention Allied? I did not, Judge. Well, don't we have a problem? Well, my belief is based on the summary judgment ruling. There is an order of... You can't appeal from a summary judgment ruling. You can only appeal from a judgment. Correct. Now, the party's briefs don't mention the possibility under Banker's Trust against Malice that the district court is so clearly done with it that the lack of compliance with Rule 58 should be ignored. Is that perhaps the theory of the appeal here? Well, I believe the district court was done with it. We had proceedings after the summary judgment motion on prejudgment interest in that ruling. Which, of course, doesn't have anything to do with Allied. Correct. Which prevailed entirely. But clearly, the judge intended to enter a final judgment order, but Your Honor is correct. That is an error, but I don't think it should stop the court from dealing with the issues we're dealing with today. One of the reasons we have motions practice in the district court is to get these things fixed before oral argument in the Court of Appeals. I understand, Judge. All right, so we have that problem. The next question is, do we have subject matter jurisdiction in the district court? The parties appear simply to assume that any claim for demerit arises under federal law, and I wonder whether that's so. Is it so? I believe it is, based upon the South Tech case, which dealt with the acceptance of jurisdiction in this kind of setting, yes. Which case are you referring to? I'm more interested in statutes, because it's statutes that create jurisdiction. Well, I do believe the case we're talking about is the Illinois Central v. South Tech case, which this court dealt with the issue of demerit. As the Supreme Court has said, many a case deals with the merits of something, but without an express discussion of subject matter jurisdiction, it doesn't establish a holding on that point. I understand. Well, so my question is, do we have subject matter jurisdiction? What statute makes this a question within federal jurisdiction? Not sure the answer is. Is this 10743A statute? Does that do it? Does that do it? I believe so, yes. And certainly it's obviously the plaintiff's burden, and we're the defendant, to establish jurisdiction. It is everybody's burden to discuss jurisdiction. Correct. Would there be diversity here? I mean, the mountain controversy would be satisfied, but it doesn't say anything about the citizenship of the parties. Yeah, I'm not sure Wisconsin Central. We're in Illinois, LLC. My client is. No, it doesn't matter where an LLC is. The question is, what is the citizenship of every member? Right. And, of course, there's nothing in the papers that talks about that. Right. There's no pleading of diversity jurisdiction in the complaint. So, I'm not sure there is diversity, given the fact that Wisconsin Central, I believe, is in Illinois as well. And my client, a member of the LLC, is also in Illinois. Is in Illinois? A citizen of Illinois, yes. So, I'm not. Where it does business is irrelevant. Correct. So, you've mentioned two irrelevancies so far. But, as I say, there's no allegation here of citizenship. So, we're in no position to assess that. But my client, who is a member of the LLC. We may, perhaps at the end of argument, I will ask the parties for further submissions on both appellate and subject matter jurisdiction. Very well. Thank you, Your Honor. Please proceed. The issue of demerge is a contractually based charge. In other words, it's not something that just arises out of the air, or it's based on contract. I hope you realize what you just said. That's what got me worried. The issue of demerge is contractual. You know, and federal law is not normally where you turn to enforce a contract. Anyway, I hope you'll all be taking this into account. And in this case, my client was a stranger to the contract. The contract for the shipments at issue here was between the Canadian National and between SWIFT. They entered into the contract. They negotiated the contract. They negotiated the terms of the contract. There was a written agreement between them. There were bills of lading prepared for these shipments. My client didn't receive the contract, didn't receive the bills of lading, was never a part of negotiations for the contract. And so based upon the case law, and mainly we're dealing with the South Tech case, talking in the lack of steel, talking about the fact that these claims are contractually based. You have to have privity of contract. You can't bind a stranger to your contract to terms they didn't agree to. But the cases where someone was found, a person was found not to be a consignee, involved warehouse men or people who were truly just intermediaries. And TIE Energy wasn't quite that, right? Well, yes, that's where the cases come down. But my client, she was an intermediary because my client didn't ever own these TIEs. My client was performing a service. But your client made money off the TIEs, not just the storage of the goods. And in the case you're talking about, the warehouse people and the translators, they made money. They're not charities. Made money, but not made money out of doing something and selling the TIEs as your client did to Accel Energy. My client never sold the TIEs. In fact, there's an admission in the record. Well, I understand your client didn't have legal title, but what your client got out of this deal was that it got money from Accel Energy for the TIEs. And warehouse people and translators also get money for holding merchandise or for unloading merchandise or warehousing them. It doesn't make them an owner. And my client never owned these TIEs. And as Swift admitted, I already admitted, Chiron always owned these TIEs. My client couldn't take these TIEs and use them. What about this beneficial ownership idea? It was not a beneficial owner. It was performing a service. If we were the owner, we are taking these TIEs. Instead of, we want to use these TIEs. We want to sell them to somebody else. So they had to incinerate them. That was a requirement. And during the incineration process, Chiron is the owner of the TIEs. I already admitted that. My client never owned the TIEs. Does your client, is its business solely dealing with railroad TIEs? Not solely. Other issues, other items as well. But a lot of it is railroad. They don't just deal with railroad TIEs. But they deal with disposing of items. Railroad TIEs is one of them. But my client never owned the TIEs. It was never the beneficial owner. But the bottom line is, you look at Leckler Steel and Salt Tech, you still have to have privity of contract. Even if my client did have an ownership, didn't have privity, my client never agreed to these terms. My client never agreed to be a consignee. But, Mr. Borcher, your client did have a railroad site and obviously accepting 100 cards of 1,000 TIEs each suggests that they were no babe in the woods when it comes to disposal of creosote impregnated materials, whether it's railroad TIEs or power poles or bridge girders, whatever. So how can TRI Energies come into any court with a straight face about not knowing what the realities were with regard to transportation, whether it's an oral contract or a written contract or what have you? Because you can have a – first of all, we didn't have a railroad facility. We had a warehouse where we had a railroad line on a warehouse. But we never agreed to be a consignee. That's a specific designation. We never – and so – I'm sorry, I didn't mean to cut you. Are you suggesting this is the first time that TRI Energy received materials to be disposed of via rail and had no idea what a consignee or what transportation documents involved? No, but you can be just like the warehouse in the South Tech case. They receive merchandise all the time there. It doesn't make you a consignee. You can accept merchandise as an agent or a care of party. It doesn't make you a consignee. It doesn't make you responsible for the merge. Well, now you're leading to a subsidiary issue, and that is it is apparent from the limited record we've reviewed that there was truly never a traditional meeting of the minds as between CN and Wisconsin Central and TRI Energies with regard to this whole issue of consignment. And so how does the lack of a meeting of the minds interface with this whole question of operation of law that entitles the plaintiff to recover demerge? Operation of law doesn't apply in this circuit. Look at the South Tech case. The court rejected operation of law. Look at Lekulow Steel. The court said you have to have a meeting of the minds. Operation of law doesn't work because you can receive merchandise all the time. It doesn't make you a consignee or subject to demerge charges. This circuit requires under South Tech, under Lekulow Steel, even the other cases, the gross case out of the left circuit, it requires a meeting of the minds. That didn't exist here. For example, let's say in this case that SWIFT agreed for one day late it would be a $1 million penalty for demerge. Are we bound by that? Absolutely not. But that's their theory. Their theory is SWIFT can negotiate a contract with CN and read any terms they want to agree to. We're not a part of that and we're bound by it. That's their theory of the case. Under South Tech and Lekulow Steel, that's not possible because we're not a part of the contract and these are contractually based claims. Even the issue of here, the issue of operation of law is contested facts. We don't agree we ever had beneficial ownership of these ties. We never owned the ties. We have testimony and evidence supporting we didn't own the ties. We were performing a service, and the district court construed, we believe, those facts against us. Summary judgment has to be construed in favor of the non-moving party, in this case, TIE Energy. Counsel, let me ask you a question about your consignee status and its relevance to the demerge fees. Is it your position in the brief that looking at Groves from the 11th Circuit, on which the district court relied, and then South Tech from our circuit, that there's a two-step process that first you have to establish that you're a consignee, but being a consignee by itself is not sufficient to give rise to liability for demerge charges, and that's where operation of law comes in? In other words, operation of law doesn't come in in determining whether you're a consignee. It comes in in determining whether you're a consignee who also owns demerge charges? No. Well, I believe the consignee status, at least in this circuit, I believe, requires meeting in the minds of the contract, agreement to the contract. In terms of the issue of does that make you liable, not automatically. Because even if you're a consignee, you can... No, no, I understand that it doesn't automatically make you liable. The Groves court, or perhaps it was implicit in the South Tech decision, that then you look at these other factors, although the courts don't really spell out what they may be. Maybe control, maybe beneficial ownership, et cetera. But I guess my question for you is, is it your position that in this circuit consignee status itself cannot arise by operation of law as the district court assumes? Correct. That's my position. And I want to get to the issue of who the plaintiff is in this case. Because the plaintiff arose out of thin air when the lawsuit was filed. If you look at who the contract was with, it was CN. The invoices were sent by CN. The invoices from CN said pay CN. The issue of Wisconsin Central arising out of thin air when this lawsuit was filed, they're not even the proper party plaintiff in this case. So we believe that's also a defense. In terms of the issue of the finding of liability, even if you assume that as a matter of law or operating work consignee, there's issues here in terms of how these charges arose, issues in terms of we believe we're not at fault for the charges. We objected immediately. As soon as we found out we were, and this is a consignee, we contacted CN and SWIFT and said this is wrong. What does SWIFT do? We'll get it corrected. It is wrong. We'll get it corrected this afternoon. We'll get it corrected. Do they do it? No. CN then looks to not us anymore. They look to Allied or SWIFT to get paid the invoices because they realize there's a mistake here. Allied doesn't pay them. SWIFT doesn't pay them. Then they come after us again. Did emerge charges depend on faults? No, but not depend on fault. But if there's a case law that says if you're not responsible for what the delay is, for example, we have evidence in the case of these snowfalls, evidence that SWIFT didn't have the right code to get the trailers over the border. If there's evidence of other reasons for why the charges occurred, you can avoid liability. So that's why we decided the case law, and we have evidence directly to support. Even if you assume that we could be liable for demerge, in this case, because of the issues with the snow, the coding issues, them sending many more trailers than we could ever hold, we're not responsible for the demerge charges anyway, even if we were possibly responsible for the charges. I'll save the rest of my rebuttal unless you have any more questions. Thank you. Certainly, counsel. Mr. Fiorillo. Good morning, Your Honors. I'm pleased to court. I'm here today to represent Wisconsin Central Limited in this matter. Regarding the situations and the cases here, first of all, we feel that 10743A does provide jurisdiction over interstate charges that arrives out of tariffs, such as demerge, and I think that a number of the other cases in this circuit and other circuits have found the same. You think that enables, that authorizes a decision about who is the right person to pay demerge? Well, yes, Your Honor. I think it does when it's raised by the other side. In our case, we didn't have any question of who should pay demerge, and we made it clear. We didn't even sue the third party. We only sued one party, the party we knew was responsible. And, Your Honor, one of the things to remember is that the Fink case, which talked about this, is 99 years old this year, and ever since then there hasn't been any bills of lading in which the consignee signed because that doesn't happen. What happens is the shipper signs it. He sends the cars out. The railroad delivers them. If there's something wrong, the consignee can simply reject the shipment. Don't have to pay freight charges. Doesn't have to pay demerge. Doesn't have to pay anything else, but that's not what happened here. Here, this party received and accepted 100 cars. They unloaded the cars also because they could have accepted the cars, said, Hey, wait, they're not ours. Take them back. They didn't do that. No. They unloaded all the cars. They took control of the contents because they chipped them, and then they took the contents and sold them to another party for their account, not for anybody else's. They didn't have to pay a portion of this back to SWIFT. They didn't have to. They never dealt with Huron. All they did was take the money. That was the deal, and that's exactly what happened. But it made them the consignee. So is it your position that acceptance, that being named as the consignee on the bill of lading and then accepting the goods creates a presumption that you, in fact, are a consignee? Because I thought that was the Novolog case in the Third Circuit, which is not. Well, Novolog is. That was my case, so I know a lot about Novolog. But the Third Circuit has a different position. They talk about you have to tell the railroad you're not the proper party pursuant to the federal statute, and they really have a different concept. But here, first of all, Ty Energy is not a warehouseman. He just isn't. He's not a third party. He's a first party. Remember, most shipments go to people who are receiving the goods to make something else out of them, and in the case, that's what happened here. And say, for example, you were getting metal to make cans. You're going to make cans to put food product in. So you order the steel, and it comes in, and you're named the consignee, and you take that steel and you unload it and you make it into something else. Now, you didn't sign the bill of lading, but you're sure as heck the consignee, and you're sure as heck the responsible parties when you don't release the cars back to the railroad in a timely manner. And let's not forget, that's what happened here. The railroad wanted its cars back. They were railroad-owned cars. The shipping public wants to use those cars, and they have a responsibility under federal law to get the cars back so that other people can use them. So what made, in your example, the company that takes the steel, the consignee, is it the acceptance of the steel and the fact that it makes some use out of it, or is it the contract? Right, made the use out of them for their own purposes, not for someone else's. So you disagree with your opponent's position that there has to be some kind of contract or meeting of the minds ahead of time about consignee status. That's correct, and that's why when we look at Fink and we look at a number of other cases, they talk about a contract by operation of law or quasi-contract and how that happens. And the Supreme Court 99 years ago thought that was perfectly fine, and as far as I know, Groves also cited that. That was in 2009, and now Judge St. Ives cites it last year. And it's the same concept that when the cars come in, if you do certain things... Now, like, I agree, in the Third Circuit, you don't have to do much. In the Seventh Circuit, you may have to do more, okay? And as you probably know, the law has changed since this time. It's no longer the law. It changed in 2015. And because the Grove case went up to the Supreme Court and they saw the change, the problem with the circuits, and the STB, the Cyber Service Transportation Board, came up with new regulations. So obviously this is not a continuing problem because the new law says if you move the cars, you're responsible, you don't even have to be on the bill of lading. That's the new regulation. It's not the law in this case because this is prior to that. And by the way, that was pointed out by Judge St. Ives in her opinion. So the situation here, though, is that they did all of those things, and clearly it can't be said that the Seventh Circuit intended that a constantee who receives the cars and doesn't release them on time... Now, remember this. They can blame other people for this, and they can sue whoever they want. Regarding why the cars were delayed or whatever. But, for example, some of this stuff is not so. I mean, if a car is delayed at the border, the demerge doesn't start. And if the railroad doesn't come because there's snow, and you release the cars, the demerge stops. And if it takes two weeks to get there, there's no demerge for that time. That's clearly in the tariff. So, you know, this idea that this caused this is not true. The failure to release the cars caused the demerge on both ends because the cars were still coming. There was no room to put them because they wouldn't release the other ones. And, therefore, they had the ones here getting demerged and the ones over here getting demerged for the simple reason that they refused to release the cars. And, it should be noted, eventually they did release the cars, and the demerge stopped. But they wouldn't do it. They didn't think it was their responsibility. And the railroad said, somebody release the cars, please. And when Allied came to us, we said, get the authority from the person who has the car in your thing to do it, and we'll accept that. But TyEnergy wouldn't do it. They would not send a letter that we said would easily resolve this. And that's in the depositions of Mr. Bergeron. All these points that we're talking about now are admitted, no question. And that's why I feel Judge Saini found for summary judgment for the railroad in this case. Those facts, all the ones we talked about, they're uncontested, and, in fact, admitted. And that's why they're there. And that's why we think the court found for the railroad in this case, and since no one disputed any of the amounts or the dates or the times, they found for the full amount of the charges. And, Your Honor, that's why we're here today, and that's why we're asking this court to go ahead and to confirm the judgment of the district court for Wisconsin Central against TyEnergy. Do you have any other questions I could help you with? Yeah, would you respond to counsel's argument about Wisconsin Central not being the right party plaintiff? Oh, yes, I meant to. Thank you, Your Honor. There was a contract, which is in the record, between Swift, the predecessor to Ally, and CN regarding getting the cars, the amount it would cost, and so on. And in that agreement it says that CN is making this agreement for its U.S. subsidiaries, including Wisconsin Central. It says it in that bill, in that contract. That's the normal way that both Canadian railroads operate in the United States. They have purchased the Wisconsin Central Railroad. They also, I think, own the Illinois Central Railroad, and they do all the accounting portions and the billing portions in Canada. However, they do it on behalf of their wholly owned subsidiaries, and Wisconsin Central is their wholly owned subsidiary, and they do the operations in the United States, as they always have. In effect, they bought their stock, and so they continue to operate, but they have an agreement with their own subsidiary to do this accounting, to make the contracts, and to collect the revenue. But it was well known in that contract that that was the case. So Wisconsin Central provided the service, and CN, its parent, is the one that does the accounting and so on, as part of an agreement that they have with their subsidiaries. And this was part of the contract between Allied, or SWIFT, and the railroad. And it is set right in there, and I think Judge Saini found that to be the case when she reviewed the documents. Thank you. Thank you. Thank you, Mr. Fiorillo. Mr. DeCesare. Good morning, Honors. May it please the Court. To address, I think, the point that Judge Breno was making about the operation of law issue, I believe that the cases in this circuit reflect that the consignee becomes the consignee by operation of law based on its actions. And the South Tech case doesn't require a meeting of the minds. That case doesn't say that. That was, I believe, the Groves case, which isn't from this circuit. What the South Tech case says is a bill of lading alone isn't enough to make somebody a consignee. You have to look at additional factors. And the additional factors here have been gone over by your Honors as well as by Mr. Fiorillo. They agreed to accept the cars. They accepted the cars. They took beneficial ownership of these ties. They converted the ties. I'm not sure why you're making an argument on behalf of the railroad. You're representing the third-party defendant. You would like to knock out the liability, because otherwise you might have to pay. That's true, Your Honor. But I guess part of the issue here is that we've been sued on the basis that we improperly named Ty Energy as a consignee. Well, that's not simply the basis. Ty Energy says that Allied promised to make it whole for any demerit charges. And the district court said roughly, ah, but there's no written promise to that effect. Well, why isn't an oral promise sufficient? Well, because there was no oral promise either. Can a district court decide that on summary judgment? There's been no evidence presented that Ty Energy ever said that they would. Mr. Bergland didn't testify that we said that. He was asked, when did they say, who told you that Ty Energy or Allied would pay for any demerit charges? There's nothing in the record that says. What about this email where he says, we'll take care of this. We'll remember the language. We'll make sure you're not the consignee. Right. That had to do with the consignee status, which the email is taken out of context because Mr. Middaw said, I'm getting one side of the story from Mr. Bergland who says, you're all wrong. And he then goes back to the railroad and says, I'm being told by Mr. Bergland that we have this all wrong. The railroad says, no, this is the way it's set up. They're receiving it. They're taking the product. They're the consignee. Mr. Middaw went back and told Mr. Bergland that. And that's the end of it. There's no further follow-up from Mr. Bergland. He then starts changing his story about, well, I shouldn't still be responsible because of the weather and I was plowed in, there were snowstorms. But this issue of us getting it corrected is dead at that point because it's been addressed. It was addressed by Mr. Middaw. And could they have done a better job of communicating these things?  Of course. But ultimately, Allied never agreed to be responsible for any charges. Allied was not billed for these charges. Allied looked into the charges trying to be a good business. Your response is there is just no evidence that Allied ever made any such promise or were written? Correct. Okay. We will have to look at that because that's certainly not the district court's stated ground of decision. The district court's stated ground is that there was no written promise. And since oral promises are enforceable as contracts, subject to the statute of frauds, which no one has argued, if there's evidence of a written contract, of an oral promise, that is, I don't see how summary judgment can be granted. Well, I think, Judge, the position that there was an oral promise is Tynergy admitted there's no written promise and they didn't say there was an oral promise. They said we're entitled to implied indemnification under the law, which is what the district court also addressed. And the law on that is they're only entitled to that if they are blameless with respect to the charges that they're seeking to be indemnified for. And that was addressed by the district court. And that goes to the point of what caused these demerge charges, which, as Mr. Fiorello pointed out, was the failure of Tynergy to control the traffic at its siding. With the very first shipment, they held that, you know, it was delivered on November 12th. It wasn't released until November 18th. So you have two days to unload it under the tariff. Already, right off the beginning, they're four days late on 13 cars. So that created this backlog. And then Mr. Berglin admitted that he didn't even understand that he had to order in more cars that were waiting. Your client didn't know, kind of on this meeting of the minds thing, your client didn't know that Tynergy was a consignee, right? Our client didn't know the legal meaning of the consignee, no. But the nature of the agreement between the parties demonstrates that Tynergy was properly identified as the consignee. They're the ones who agreed to accept shipment. But there wasn't an agreement between the parties, orally or otherwise, that Tynergy was a consignee who was going to be liable for any demerge charges that accrued. There was no agreement between the parties specifically that there was who was going to be the consignee. The term consignee was not part of the agreement. Was there an agreement about demerge charges and who would be liable? Because it doesn't have to be the consignee, right? The consignor could say, pursuant to this contract, I'll assume liability for demerge charges. They could. But under the law, the consignor is responsible for demerge incurred at the shipping destination. The consignee is responsible for demerge charges incurred at the destination. And just, again, was this the best agreement between these parties? No, but the very nature of the agreement itself created this relationship and created the obligations on behalf of Tynergy. Again, not to repeat it, but their agreement was, we'll accept these ties, we'll dispose of them, we'll give you the documentation to show that we dispose of them. That was the agreement. And that agreement carried with it consequences. Now, they don't want to accept those consequences. They want to blame everybody else for it. But it was their responsibility. And, again, the very beginning, the very first shipment, when Allied tried to step in and say, we'll help you, Tynergy said no. Tynergy refused to provide the written authorization to allow Allied to do anything with the cars at Tynergy's location. And, again, this idea that they were an agent, they weren't an agent. These are two business parties who entered into an arm's-length transaction, both of whom received consideration for that agreement. As you pointed out, these ties were sold. They can call it whatever they want. They weren't an intermediary. They weren't taking these to excel energy on behalf of Allied. Mr. Berglund said right in his deposition testimony, they didn't tell me what to do with the ties. I told them I was taking them to excel energy to destroy them because that's what they agreed to do. These are two businesses that entered into an arm's-length transaction. There's not an agency relationship. And, again, there are consequences to the agreement that they made, although it's an unsophisticated agreement. Unless the Court has any other questions, I think that addresses what I wanted to address. Thank you. Thank you very much. Anything further, Mr. Borshett? Yes, Your Honor. The last point you made is we decided what to do with the ties. That's absolutely not true. What Swift said is you must have these incinerated. You can't just take these ties, use them yourself, or you've got to have them incinerated. And there was no option for Rockland to do anything else with them. We had to perform that service for them. The issue of what he said was that there was no promise to indemnify or get this corrected. The email Your Honor pointed out is clear. Not I'll investigate this. I will get this corrected. I will get this dealt with. That was their promise to us. Didn't do it. Then he talked about the fact, well, we were never invoiced by this by CN. Yes, they were. In the appendix we cite to the deposition, in AA38 in the deposition of the CN representative, they were invoiced for it. Swift refused to pay the invoice. And that's where they came knocking back on our door. So one of the things that counsel talked about was, Mr. Fiorillo, that we were late bringing them back. Remember that? He said we were late. How was my client to know what the dwell time was, the time we had to return the cars? He said it's two days. Well, where did that come from? Did my client know that? Did my client agree to that? Absolutely not. These were terms negotiated between them. Well, how is my client bound by their terms? He's not. That's why the Leko Steel case talks about, and that's in the circuit, you have to have a meeting of the minds. You can't just dictate terms from third parties and say, now we're going to impose them on you. We negotiated them. We're going to have a million dollars a day for the merge. They negotiated that. We're responsible for it, right? That's absurd. And your client never saw the bill of lading? Never saw them, never received them, never saw the contract, never agreed to them. Mr. Fiorillo talks about the fact that, well, we received these goods. That's the same as in South Tech. Leko Steel, Groves, Cary Transit, all these companies' defendants were sophisticated. They had facilities. They received rail cars. They unloaded rail cars. They're found not liable. Why? They didn't agree to be the consignee. The fact that you receive goods and you make money off receiving goods, which they all did, they're not charities there. They receive money. They benefit. They're still not liable because for a consignee you have to have consent and you have to be a part of the contract. Here they weren't. Lastly, Mr. Fiorillo talked about the fact that all these facts are admitted that were the reason why these charges occurred. That's not the record. The record in this case shows those were disputed facts. When these rail cars were first shipped, Swift didn't know what they were doing. They didn't give CN the code needed to get the rail cars over the border. So what happened? All these rail cars stacked up at the border. And then when they finally figured out what they were doing, they released it one time. Many, many, many rail cars released one time, all shipped down to my client's facility. My client had a small facility, couldn't handle more than 8 to 10 cars. So what happens? They give us 8 to 10, and the rest of them, they put out in their facility and hold them there. And they start charging us. Day by day by day. They're charging us because they screwed up. They couldn't figure out how to get the cars across the border. The issue of the snow. My client couldn't push these rail cars off of its track because CN didn't plow its track. So we have these rail cars sitting there. We're trying to get them back. The district court said that you didn't have evidence of that in the record. You didn't develop evidence on that point. There is evidence in the record. Mr. Berglund's deposition, there's also his affidavit. Mr. Wetus's deposition, which the district court never even considered. In the Berglund affidavit, she said it wasn't under penalties of perjury. It was. The first sentence of the affidavit says under penalties of perjury. So she didn't consider that, but the fact is it is in the record. It's in the deposition and the affidavits. And speaking of the record, we moved for summary judgment in this case. The plaintiff did not respond to our fact statement. Under the law, you're required to respond, or those facts are deemed admitted. And so all of our facts in our motion against the plaintiff are deemed admitted. The district court didn't do that. She considered the fact statements in response to the summary judgment motion they filed against us as part of that evidence. And the law says you have to consider each motion separately. So for our motion against the plaintiff, those facts are all deemed admitted. And yet the district court didn't do that. But there is evidence in the record about the snow issue, about the coating issues, about the fact that Allied didn't know what it was doing. You asked the question earlier, didn't even know what a constantine was. Thank you, counsel. Thank you, Your Honor. The case will be taken under advisement.